**UNITED STATES DISTRICT COURT**

**DISTRICT OF COLORADO**

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO
2020 JAN 13 AM II: 02
JEFFREY P. COLWELL
CLERK
BY_____DEP. CLK

Civil Action No. \_\_\_'20 - CV - 00097\_\_\_

KRYSTINA ANDREA ROMERO

      Plaintiff,

v.

FRANKLIN D. AZAR & ASSOCIATES, P.C., a Colorado corporation,

      Defendant.

---

## PLEADING

---

Plaintiff Krystina Romero, 6750 E Chenango Avenue, Apt. 505, Denver, Colorado 80237 alleges the following:

### I.   JURISDICTION AND VENUE

1.   This Court has jurisdiction of Plaintiff's federal law claims pursuant to 28 U.S.C. § 1331, as this case involves questions of federal law.

2.   The Court also has supplemental jurisdiction over the claims that do not contain a question of federal law as the arise from a common nucleolus of operative facts. Accordingly, if a plaintiff has both federal and state claims, the federal court has discretion to exercise supplemental jurisdiction over the claims arising under state law if the two claims derive from a common nucleus of operative facts and are such that a plaintiff would be ordinarily be expected to try them all in one judicial proceeding.

3.      Venue is proper in, and Franklin D. Azar & Associates, P.C. is subject to the personal jurisdiction of this Court because Defendant maintain facilities and business operations in this District, and all or most of the events giving rise to this action occurred in this District. 28 U.S.C. § 1391(b); 42 U.S.C. § 2000e-5(f)(3).

## II.   THE PARTIES

4.      Plaintiff Krystina Andrea Romero (For now on, "Plaintiff Romero"), is a Spanish-speaking Puerto Rican and Hispanic. She worked as a Law Clerk for Defendant, from May 3, 2019 to October 15, 2019.

5.      Upon information and belief, Franklin D. Azar & Associates, (For now on, "Defendant"), is a law firm that maintains six office locations in Colorado and employs more than 100 individuals. Defendant operates an office in Aurora, Colorado – 14426 E Evans Ave, Aurora CO 80014. All or most of the events alleged herein occurred while Plaintiff was employed by Defendant in that office.

6.      At all times relevant herein, Defendant had at least fifteen employees, and was therefore an "employer" within the meaning of Title VII.

7.      Defendant was also an "employer" within the meaning of the Equal Pay Act.

8.      Defendant is liable for the acts of their agents and employees as set forth below.

9.      Plaintiff is informed and believes and thereon alleges that at all times relevant herein, the Defendant was responsible in some manner for the occurrences and injuries alleged in this complaint.

## III.   EXHAUSTION OF ADMINISTRATIVE REMEDIES

10.      Plaintiff timely filed charges of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and the Colorado Division on Civil Rights. On or around October 24, 2019, the EEOC issued Plaintiff Notices of Right to Sue.

11.    Plaintiff has timely filed this action and have complied with all administrative prerequisites to bring this lawsuit.

## IV.    FACTUAL ALLEGATIONS

12.    At all times material to this action, Plaintiff Romero was employed by Defendant as a Law Clerk in Defendant's Aurora, Colorado office. Plaintiff was hired to work full-time for $28.85 per hour on May 3, 2019.

13.    The other Personal Injury Law Clerk – Brian Conroy (For now on, "Law Clerk Conroy")– hired by Defendant was a salary employee making $60,000 per year. He was a male born and raised in the United States of America; and he only spoke one language – English. Law Clerk Conroy and Plaintiff performed substantially equal job.

14.    The terms and conditions of employment were stablished by the Employment Offer Letter and the Confidentiality, Non-Disclosure and Non-Solicitation Agreement (From now on, 'Entire Employment Agreement'). The Entire Employment Agreement contained liquidated damages clauses and the termination of the employment contract would commence the two-year period of the Non-disclosure and Non-use clause of the Confidentiality Agreement.

15.    Plaintiff was assigned to work for two mentors – Jennifer Torres (For now on, "Mentor Torres") and Peter McCaffrey (For now on, "Mentor McCaffrey"). Mentors have authority to direct and oversee mentees' daily work. Mentors report to supervisors about mentees performance.

16.    Law Clerk Conroy was assigned to work for one mentor at a time. Conroy's mentor was also Peter McCaffrey

17.    Plaintiff speaks two languages – Spanish and English – and is licensed in one jurisdiction of the United States of America – Puerto Rico. As part of her job, she was responsible for helping her mentors with documents drafts and clients' communications. She also communicated with her mentors' English-speaking and

Spanish-speaking clients. On occasion, Plaintiff was asked by receptionists to take intake calls when all the Spanish-speaker employees in the intake department were busy.

18.     During all the time Plaintiff was employed, Olga Malcom (For now on, "Malcom"). was Defendant's supervisor, administrator and head of the Human Resources Department. Zach Balkin was the other law firm's supervisor (For now on, "Supervisor Balkin").

19.     On or around May 16, 2019, Plaintiff informed Malcom that she had passed the Puerto Rico's BAR exam.

20.     Defendant uses a platform – Pingboard – to help employees identify each other. After Plaintiff passed Puerto Rico's bar exam, she appeared on the platform as a Spanish speaking law clerk and attorney.

21.     Plaintiff started receiving invites to join attorney's activities. She was invited to join the monthly DTC Breakfast Club Meetings and the weekly 'Attorney Round Table Meetings'.

22.     Plaintiff received the last invitation to join the DTC Breakfast Club Meeting the week she did the attorney oath in Puerto Rico.

23.     On June 11, 2019, Human Resources, Crystal Chavez (For now on, "HR Chavez"), informed Plaintiff that she became a salary employee on June 1st, 2019. Plaintiff was never informed of what her salary would be.

24.     Between June 12, 2019 and July 11, 2019, HR Chavez handled Plaintiff an "Attorney Contract". The "Attorney Contract" would employ Plaintiff as an attorney for a $65,000 annual salary.

25.     On or after July 11, 2019, Plaintiff met with Malcom and requested some edits to the attorney employment contract because she did not want to be referred as an "attorney" in any employment contract outside of Puerto Rico.

26.     On that meeting, Malcom told Plaintiff that she would not edit the

Attorney Contract. Malcom said that the most she could do was to wait for Plaintiff to become formally licensed in Puerto Rico to sign the 'Attorney Contract'.

27.     On August 16, 2019, the president and owner of the law firm, Franklin D. Azar, and Malcom told Plaintiff she would be assigned cases. Now, Plaintiff's job responsibilities were adjusted to include the management of those cases assigned to her.

28.     Plaintiff traveled to Puerto Rico from August 17, 2019 to August 25, 2019 to do the Attorney Oath.

29.     On September 3, 2019, Plaintiff was assigned cases for the first time. She was assigned thirty (30) cases. It was the company's custom to initially assign less than 10 cases to las clerks and then build up at a rational pace.

30.     Plaintiff believes and thereon alleges that the departure from the Company's policies in the assignment of her cases and additional and excessive assignment of work was a retaliatory measure against her for not signing the Attorney Contract during the first week (or any time) after she did the attorney oath –deadline Malcom said she was willing to wait for Plaintiff to sign it.

31.     Prior September, Plaintiff can only remember three specific instances where she was requested to assist an attorney with their work – Tonya Melnichenko (ICM), Kenny Pennywelth (Pay Off) and Matthew Bennet (client contact phone call). Most of them requested and scheduled with anticipation.

32.     On September 3, 2019, Daniel Lowey (From now on, "Coworker Lowey"), Spanish speaking and Jr. Attorney, requested Plaintiff to draft a complaint for him. Plaintiff refused Coworker Lowey's request because her schedule was full with her own assigned work. However, Coworker Lowey insisted and questioned Plaintiff for the reasons of her refusal. Plaintiff let him know she felt uncomfortable with his insistences and all of his inquiries.

33.     Coworker Lowey told Plaintiff that Supervisor Balkin told him he could

use Plaintiff's help with his Spanish Clients.

34.    Mentor Torres told Plaintiff that it was Defendant's policy that Jr. Attorneys had to handle their cases on their own and advised Plaintiff not to help coworker Lowey.

35.    It was the Defendant's policy that Jr. Attorneys had to handle all their cases on their own. Supervisor Balkin authorized Coworker Lowey to assign his work to Plaintiff because of her Spanish fluency – specifically, to help him with his Spanish clients.

36.    On September 3, 2019, Plaintiff and *Spanish speaking* attorneys were requested by Haidee Ferreyra, marketing assistant, *mandatory attendance* to a Sunday promotional event (For now on, "the promotional event") in an hispanic cultural celebration ("Fiestas Patrias" at Denver Civic Park) without additional compensation. Attorneys were supposed to attend to the event for at least four hours.

37.    On September 6, 2019, Supervisor Balkin sent a mass email regarding "the promotional event" attendance schedule. He assigned only two Spanish speaking employees ("attorneys") to work – Mentor Torres and Plaintiff. Furthermore, Supervisor Balkin assigned Plaintiff to work *six hours more* than what he assigned to Mentor Torres.

38.    By the date of "the promotional event" the law firm had around six Spanish Speaking Attorneys. All the Spanish Speaking attorneys licensed to practice law in Colorado were born or raised in a state of the United States.

39.    Plaintiff was the only Spanish speaking person admitted to practice law in a jurisdiction of the United States whose first language was Spanish and who was born and raised in a Hispanic country and culture. She was the only employee born and raised in Puerto Rico.

40.    On September 12, 2019, Coworker Lowey asked Plaintiff to contact one of his Spanish speaking clients to give the case's status, but she refused. He

continued insisting and Plaintiff reported the situation to Mentor Torres.

41.    On September 13, 2019, Coworker Lowey questioned Plaintiff for complaining to Mentor Torres about his recent conduct. He told Plaintiff that he was *"above her"* because she was an attorney from Puerto Rico, and he was an attorney from Colorado. Plaintiff reported the incident to Mentor McCaffrey.

42.    On September 16, 2019, Mentor McCaffrey asked Plaintiff whether he could assign her work or if she was going to feel insulted as happened with Coworker Lowey. Later that day, Mentor McCaffrey suggested Plaintiff that she could learn something from one of his clients and be nicer. Furthermore, Mentor McCaffrey started to assign Plaintiff to draft more documents that he had ever assigned her before Plaintiff complaint about the discriminatory conduct.

43.    After Plaintiff reported the incident to Mentor McCaffrey, many other attorneys and employees started assigning her more work and interrupted her work responsibilities due to her Spanish fluency as a retaliatory measure for her complaining to mentor McCaffrey (protected activity). The receptionists started assigning her more Spanish intake calls than usual. Furthermore, a week after she complained, Supervisor Balkin demoted her to case analyst in the middle of a meeting and in front of all the attendees; and, Malcom ordered her to start attending the Case Analyst Meetings – less prestigious assignments.

44. After Plaintiff complained about the incident with Coworker Lowey, she started receiving emails reminding her that she was supposed to attend the Case Analyst Meetings every time she attended the Attorney Round Table Meeting. Moreover, many senior attorneys and other employees did not respond to her requests to move forward her cases. Requests to rescind, settle or transfer cases were not being answered and Plaintiff's cases were starting to fall behind. Plaintiff's work was being sabotaged.

45.    In one occasion an attorney interrupted Plaintiff in the middle of a

training presentation and made her step out of the conference room in front of all the attendees to assign her his work due to her Spanish fluency. Plaintiff felt humiliated because of the way she was requested to step out of a conference in front of many of her coworkers to do someone else's work on the basis of her nationality and Spanish fluency without any regard on her own responsibilities. Activity she had recently complaint about to her mentors. Plaintiff was being retaliated (retaliatory harassment) for complaining to her mentors – activity that is protected by law.

46.    By October 4, 2019, Plaintiff had already around 48 cases and Mentor McCaffrey told her that a superior (either Malcom or Balkin) wanted to assign her more cases. Law Clerk Conroy never had over 30 cases assigned to him.

47.    On October 7, 2019, Plaintiff submitted a *formal complaint* to Malcom and to HR Chavez regarding the mistreatment she was perceiving since she stood up to Coworker Lowey's discriminatory verbal conduct.

48.    Malcom told Plaintiff to try to resolve the issue with one of the harassers she complained about – Supervisor Balkin. Later that day, Malcom requested Plaintiff to go to her office to talk about the concerning situation and Supervisor Balkin was already in the office. He stayed in the office during the whole meeting and sat immediately next to Plaintiff. During the concerning situation meeting:

      a.    Malcom revealed to Plaintiff that she was who ordered Shannon Marino to request Plaintiff's presence in the Case Analyst Meetings. Furthermore, Malcom and Supervisor Balkin told Plaintiff that whenever a senior attorney requested her something, she had to assume that Malcom requested it.

      b.    Supervisor Balkin clarified that plaintiff's sole job responsibility was to take care of her assigned cases and to meet with her mentors once a week to review them.

    c.    Plaintiff inquired on how much time-off she could take to study for the 2020 February Colorado's bar exam. Malcom told Plaintiff that she could take up to six weeks and that Defendant's company would continue paying her during her study break but that she would receive less money than usually. Malcom disclosed that Defendant's company would pay Plaintiff, as it has done with the past law clerks, around $4,000 a month – Malcom initially stated $4,500.

49.    On October 7, 2019, Plaintiff was making less than $4,000 a month working full-time. Other law clerks were being paid Plaintiff's regular wage for their time-off to study. The other law clerk had a higher wage for substantially equal work.

50.    At the end of the concerning situation meeting, Malcom informed Plaintiff that she violated the attorney-client privilege and revealed so on the discrimination complaint she submitted to Human Resources. However, Plaintiff's disclosure was not protected by the attorney-client privilege and, therefore, Plaintiff did not violate the Attorney-Client Privilege.

51.    Supervisor Balkin and Malcom responded to Plaintiff's arguments against the attorney-client privilege violation allegations saying that Plaintiff violated the Confidentiality Agreement regardless. Neither Supervisor Balkin nor Malcom specified what part of the confidentiality agreement Plaintiff violated.

52.    Malcom and Supervisor Balkin accused Plaintiff of violating the Confidentiality Agreement when she submitted a formal written complaint for a hostile environment and discriminatory treatment.

53.    On October 9, 2019, Plaintiff was *invited* to go to another Case Analysts meeting. The Case Analyst Meeting was unrelated to Plaintiff's job responsibilities. Plaintiff attendance to the Case Analyst meeting was unnecessary and interrupted her job responsibilities.

54.    On October 10, 2019, Mentor McCaffrey asked Plaintiff why she was acting different. Plaintiff explained Mentor McCaffrey what she had been going through since she came back from Puerto Rico. Mentor McCaffrey told her not to take it personal because *it was common for Spanish-speaking employees to be overworked on Defendant's company.*

55.    Plaintiff started looking for employment outside Defendant's company because she could not stand the stress and the working conditions. On October 12, 2019, Plaintiff went to a job interview at Manuel Solis Law firm but abandoned employment negotiations because they could not pay for her time-off to study for the bar exam as Defendant's company said it would.

56.    On October 15, 2019, Supervisor Balkin and Malcom fired plaintiff for the alleged violation of the confidentiality contract. The alleged violation of the confidentiality contract was a *pretext* to fire plaintiff for complaining about the retaliatory harassment (protected activity) she was undergoing for complaining to her mentors about Coworker Lowey's discriminatory harassment.

57.    The Confidentiality Agreement forbids the disclosure of Proprietary Information and is subordinate to the Code of Professional Responsibility – it forbids any violation of the Attorney-Client privilege.

58.    The information Plaintiff disclosed did not include Proprietary Information. The Confidentiality Agreement specifies that "Proprietary Information" does not includes individual client information which is generally available, and client information subject to and protected by the Code of Professional Responsibility.

59.    The Colorado Code of Professional Responsibility identifies the client information that is considered confidential and protected from disclosure as well as its exceptions. The Colorado Code of Professional Responsibility [Art. 1.6] states that "A lawyer may reveal information relating to the representation of a client to

the extent the lawyer reasonably believes necessary: to detect and resolve conflicts of interest arising from the lawyer's change of employment or from changes in the composition […] of a firm, but only if the revealed information is not protected by the attorney-client privilege and its revelation is not reasonably likely to otherwise materially prejudice the client".

60.    Plaintiff revealed the information because she reasonably believed it was necessary to detect and resolve conflicts of interest arising from her change of employment and from changes in the composition of Defendant's company. Furthermore, the revealed information was not protected by the attorney-client privilege and its revelation was no reasonably likely to otherwise materially prejudice the client.

61.    The client's information that Plaintiff disclosed was subject to and protected by the Code of Professional Responsibility. Therefore, Plaintiff did not disclose "Proprietary Information" and did not violated the attorney-client privilege. Hence, Plaintiff did not violate the Confidentiality Agreement and complied with its terms. Defendant's accusation were a pretext to fire Plaintiff for her protected activity.

62.    The Confidentiality Agreement has a clause titled "ENTIRE AGREEMENT" which states: "This Agreement and the 'Attorney Employment Agreement' ("Law Clerk Employment Offer Letter") constitute the entire understanding between the parties hereto with respect to the subject matter hereof ("Employment Agreement") […]". The Confidentiality Agreement and the Employment Offer Letter constituted the entire understanding (agreement) between the parties with respect to the employment terms and conditions (From now on, "Entire Employment Agreement").

63.    The Employment Offer Letter was conditional to the adherence of the Confidentiality Agreement. Therefore, the Entire Employment Agreement was a

bilateral agreement where Defendant would receive Plaintiff's services and discretion (adherence to the Confidentiality Agreement) in exchange of a monetary compensation – her wage.

64. One contract would not have existed without the other and the termination of either could affect the other. Both documents constituted one agreement; one contract. Documents executed together as part of a single transaction should be considered together in asserting the intent of the parties.

65. The Confidentiality Agreement contains two liquidated damages clauses – Accounting for Profits and Indemnification. Moreover, the Confidentiality Agreement two years period of Non-Disclosure and Non-Use commenced when Plaintiff's employment was terminated. The termination of the employment agreement had legal consequences.

66. Defendant falsely accused Plaintiff of violating the Confidentiality Agreement and proceeded to terminate Plaintiff's employment. Defendant never specified what part of the contract Plaintiff violated. Defendant's allegations were unfounded and contrary to the agreement's terms – they were a pretext.

67. Plaintiff adhered to the terms and conditions of the Entire Employment Agreement and performed accordingly.

68. On October 18, 2019, HR Chavez sent Plaintiff a Separation Agreement asserting that Plaintiff worked as an *attorney* for Defendant since May 3, 2019. Plaintiff did not sign the Separation Agreement.

69. Plaintiff suffered severe emotional distress as a consequence of the events she underwent at Defendant's Company since she arrived from doing her attorney oath in Puerto Rico.

## V.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

National Origin-Based Discrimination (Disparate Treatment) in Violation of

Title VII of the Civil Rights Act of 1964, *as amended*,

42 U.S.C. § 2000e-2(a)

70.    The allegations contained above are incorporated by reference as if again fully set forth herein.

71.    Section 703 of Title VII, 42 U.S.C. § 2000e-2, prohibits employment practices that discriminate against persons on the basis of their national origin.

72.    Plaintiff alleges that she was treated negatively different than other employees because of her protected class and national origin – Spanish speaking Puerto Rican and Hispanic.

73.    Defendant knew of Plaintiff's protected class. Defendant assigned Plaintiff additional work on the basis of her Spanish fluency. Only Spanish speaking attorneys were requested mandatory assistance for the "promotional event". Furthermore, Supervisor Balkin singled out Plaintiff and scheduled her to work four times more than the other assigned Spanish speaking attorney from another nationality. In doing so, Supervisor Balkin revealed Defendant's unlawful discriminatory bias against Plaintiff.

74.    Defendant permitted or promoted his employees and attorneys to constantly interrupt Plaintiff's job performance by assigning her extra work due to her nationality and Spanish fluency without consideration of her own work load and responsibilities. Defendant suddenly started assigning more work than Plaintiff could possibly complete in her allotted hours and in doing so, he violated his own policies. Defendant was setting up Plaintiff to fail through unfair assignment of work.

75.    Furthermore, Plaintiff alleges she had a lower wage than the other law clerks in spite of being the only one that speaks more than one language and the only one admitted to practice law in a jurisdiction of the United States. She was hired to work for $28.85 per hour while the other personal injury law clerk was hired for a

$60,000-year salary. Personal injury law clerks had substantially the same work responsibilities. Furthermore, Defendant unilaterally changed Plaintiff's hourly salary without any verbal or written agreement. Defendant never told Plaintiff what her salary was, and Plaintiff has no knowledge of the deductions being made to her paychecks.

76.    Others who were similarly situated were either treated more favorably or not subjected to the same or similar adverse treatment. Non-Spanish speaking attorneys were not assigned mandatory assistance to the promotional event; and law clerk Conroy was never assigned more than 35 (he personally specified he never managed more than 30) cases and had a higher wage than Plaintiff.

77.    Defendant's employees - agents and supervisors - constant interruptions and discriminatory acts were neither manifestly job-related nor consistent with business necessity. On the opposite, the constant interruptions and discriminations sabotaged Plaintiff's work performance had a negative impact on her responsibilities and cases management. Her cases were starting to fall behind due to her request being ignored and because she had to neglect her responsibilities to work on intake calls and other attorneys requests.

78.    Less discriminatory alternatives existed to achieve Defendant's business purposes.

79.    As a direct, legal and proximate result of the discrimination, Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

80.    Defendant's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from discrimination based on national origin.

81.    Plaintiff includes in this claim as nationality-based discrimination (instead of sex-based discrimination) the allegations made in the Fourth Claim

regarding unequal pay [allegations contained in paragraphs 120 through 126, below].

82.     Plaintiff is entitled to her reasonable attorney's fees and costs of suit.

## SECOND CLAIM FOR RELIEF

National Origin-Based Discrimination (Hostile Work Environment) in Violation of

Title VII of the Civil Rights Act of 1964, *as amended*,

42 U.S.C. § 2000e-2(a)

83.     The allegations contained above are incorporated by reference as if again fully set forth herein.

84.     Plaintiff belongs to a statutorily protected class – born and raised Spanish speaking Hispanic and Puerto Rican.

85.     Plaintiff was subjected to inappropriate and unwelcome verbal conduct from Coworker Lowey due to her nationality – Puerto Rican. Attorney Lowey tried to delegate his work to Plaintiff against the company's policy on the basis that he was "above" Plaintiff because he was an attorney from Colorado and she was an attorney from Puerto Rico.

86.     Attorney Lowey's harassment was based on Plaintiff's statutory protected class – Spanish speaking Hispanic and Puerto Rican.

87.     Plaintiff complaint to her mentors McCaffrey and Torres about attorney Lowey's harassment. Plaintiff complaint was a protected activity.

88.     Right after Plaintiff complaint of Coworker Lowey's derogatory verbal conduct, she suffered tangible and adverse employment actions [demotion to Case Analyst, transfer to Case Analyst meetings (less prestigious assignments), interference with training presentations (prestigious work assignments), freezing the employee out from the DTC Breakfast meetings and termination], work sabotage (unreasonably interferences of Plaintiff's job performance to delegate the work of other attorneys who were not her assigned attorneys, increased assignment of intake calls and the requests to assists to two weekly meetings), humiliation and ridiculing,

by Defendants' agents, employees and supervisors.

89.     Defendant's employees constantly interrupted Plaintiff's work and assigned her extra work because of her Spanish fluency and national origin. The unwelcomed requests were based on Plaintiff's protected class and affected a term or condition of employment. Plaintiff now had to work for more attorneys than the ones assigned to her, had to neglect her own responsibilities and her performance was being affected. The unwelcomed requests had the purpose or effect of unreasonably interfering with the work environment and created an intimidating, hostile or offensive work environment.

90.     Defendant's - agents, employees and supervisors - conduct was undertaken because of Plaintiff's national origin and Spanish fluency.

91.     Defendant's agents', employees' and supervisors' conduct was not welcomed by Plaintiff.

92.     The alleged discriminatory incidents were frequent, severe and patently offensive; they created a hostile and abusive work environment.

93.     The harassment affected a term, condition or privilege of Plaintiff's employment.

94.     The harassment had the purpose and effect of unreasonably interfering with Plaintiff's work performance and resulted in adverse employment action.

95.     The conduct was so severe or pervasive that reasonable persons in Plaintiff's position would find their work environment to be intimidating, hostile or abusive.

96.     Plaintiff work environment was intimidating, hostile or abusive as a result of Defendant's agents', employees' and supervisors' conduct.

97.     Enduring the offensive conduct became a condition of continued employment.

98.     Management level employees knew, or should have known, of the

abusive conduct. Plaintiff provided management level personnel – Mentor McCaffrey, Mentor Torres, Malcom, Supervisor Balkin, HR Chavez, and Franklin D. Azar – with sufficient information to raise a probability of national origin harassment in the mind of a reasonable employer. Moreover, the harassment was so pervasive and open that a reasonable employer would have had to have been aware of it. Indeed, management level employees – Malcom and Supervisor Balkin – were themselves complicit in the abusive conduct and encouraged coworker ostracism.

99.   Defendant did not exercise reasonable care to prevent harassment in the workplace on the basis of national origin and did not exercise reasonable care to promptly correct any harassing behavior that did occur. On the contrary, they contributed to the harassment after Plaintiff made the first informal complaint to Mentor McCaffrey regarding Coworker Lowey's verbal conduct against her nationality.

100.   As a direct, legal and proximate result of the discrimination, Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

101.   Defendant's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from discrimination based on national origin.

102.   Plaintiff is entitled to their reasonable attorney's fees and costs of suit.

### THIRD CLAIM FOR RELIEF

Retaliation (including Co-Workers and Supervisory Retaliatory Harassment) in

Violation of

Title VII of the Civil Rights Act of 1964, *as amended*,

42 U.S.C. § 2000e-3(a)

103.   The allegations contained above are incorporated by reference as if again fully set forth herein.

104.   Section 704(a) of Title VII of the Civil Rights Act of 1964, *as amended*, prohibits employers from discriminating against an employee "because [she] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a).

105.   Plaintiff made two informal and one formal complaints to Defendant's agents, employees and supervisors opposing Defendant's employees unlawful, discriminatory employment practices based on national origin.

106.   Plaintiff opposed a violation of Title VII when she complaint to Mentor McCaffrey about Coworker Lowey's derogatory and discriminatory comments about her nationality. Plaintiff's complaint was a protected activity.

107.   Plaintiff alleges that Supervisor Balkin and Malcom demoted her to Case Analyst responsibilities and job title right after she stood up against Coworker Lowey's derogatory comments about her nationality – Puerto Rican – and complaint to her mentors.

108.   Plaintiff alleges that Defendant's employees – attorneys, case analysts and receptionists – started assigning her more work and more frequently, right after she stood up against coworker Lowey's derogatory comments about her nationality – Puerto Rican – and complaint to her mentors.

109.   Right after Plaintiff complaint of Coworker Lowey's derogatory verbal conduct, she suffered tangible and adverse employment actions (demotion, transfer to less prestigious assignments, interference with prestigious work assignments, freezing the employee out from meetings and other workplace activities, termination), work sabotage (unreasonably interferences of Plaintiff's job performance), intimidation, humiliation and ridiculing, by Defendant's agents, employees and supervisors. The retaliatory harassment affected a term (ie. Job title), condition (ie. Working for any other attorney – who was not her assigned attorney – that assigned her work) or privilege (ie. DTC breakfast meetings attendance) of

Plaintiff's employment.

110. Defendant's agents, employees and supervisors, created a hostile work environment as *retaliation* for opposing and complaining against Coworker' Lowey discriminatory verbal conduct. Many of the retaliatory harassing incidents were based on Plaintiff's Spanish fluency.

111. Defendant's supervisory or management personnel either orchestrated the harassment or knew about the harassment and acquiesce in it in such a manner as to condone and encourage the coworkers' actions. Gunnell v. Utah Valley State College, 152 F.3d 1253. Furthermore, Malcom revealed to Plaintiff that she was who ordered Senior Attorneys to affect Plaintiff's employment terms and conditions and interrupt her job performance and responsibilities. Management level employees were themselves complicit in the abusive conduct and encouraged coworker ostracism.

112. Management level employees knew, or should have known, of the abusive conduct. Plaintiff provided management level personnel with sufficient information to raise a probability of national origin harassment in the mind of a reasonable employer. Moreover, the retaliatory harassment was so pervasive and open that a reasonable employer would have had to have been aware of it.

113. Defendant did not exercise reasonable care to prevent retaliatory harassment in the workplace and did not exercise reasonable care to promptly correct any retaliatory harassing behavior that did occur.

114. Defendant's adverse actions constituted retaliatory workplace harassment.

115. Defendant terminated Plaintiff's employment a week after she submitted her formal complaint (protected activity) to Human Resources and the administration (Malcom) about all the discriminatory and materially adverse actions taken against her after she complaint to her mentors about the discriminatory actions

of Coworker Lowey.

116. Defendant's reasons to terminate Plaintiff due to a violation of the confidentiality agreement was a Pretext. Plaintiff did not violate the Confidentiality Agreement.

117. Defendant terminated Plaintiff's employment based on the evidence presented on the formal complaint she submitted about the office's discriminatory practices.

118. As a direct, legal and proximate result of the discrimination, Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

119. Defendant's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from discrimination based on national origin.

120. Plaintiff is entitled to their reasonable attorney's fees and costs of suit.

## FOURTH CLAIM FOR RELIEF

Sex-Based Discrimination in Violation of

Title VII of the Civil Rights Act of 1964, *as amended*,

42 U.S.C. § 2000e-2(a)

121. The allegations contained above are incorporated by reference as if again fully set forth herein.

122. Title VII of the Civil Rights Act of 1964, *as amended*, makes it unlawful for an employer, "(1) to […] to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, *sex*, or *national origin*; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's

race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

123.   Defendant discriminated against Plaintiff by treating them differently from their male coworkers, including tasks assignment and compensation, because of her sex.

124.   Plaintiff was given more work and responsibilities for lower wage than her coworkers Law Clerk Conroy and Law Clerk Parker.

125.   Plaintiff's sex was the determining factor and/or a motivating factor in Defendant's actions.

126.   As a direct, legal and proximate result of the discrimination, Plaintiff has sustained, and will continue to sustain, economic damages to be proven at trial. As a result of Defendant's actions, Plaintiff has suffered emotional distress, resulting in damages in an amount to be proven at trial. Plaintiff further seeks compensatory and punitive damages and all other injunctive, declaratory, and monetary relief available for discrimination at trial.

127.   Defendant's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from discrimination based on sex.

128.   Plaintiff is entitled to reasonable attorneys' fees and costs of suit.

### FIFTH CLAIM FOR RELIEF

Sex-Based Pay Discrimination in Violation of

Equal Pay Act, 29 U.S.C. § 206(d)(1)

129.   The allegations contained above are incorporated by reference as if again fully set forth herein.

130.   Section 206(d)(1) of the Equal Pay Act makes it unlawful for an employer "to discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal

skill, efforts, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system, (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex."

131.   Defendant employed Plaintiff and two other male employees as law clerks, requiring substantially equal skill, effort, and responsibility.

132.   Plaintiff and male employees performed their jobs under similar working conditions.

133.   Plaintiff was paid a lower wage than the male employees doing substantially equal work.

134.   The differential in pay between male and female employees was not due to a bona fide seniority system, a bona fide merit system, or a bona fide system that measures employee earnings by quantity or quality of work, nor was the difference in pay a result of a factor other than sex.

135.   Plaintiff's sex was the determining factor and/or a motivating factor in Defendant's actions.

136.   Defendant's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from discrimination based on sex.

137.   As a direct, legal and proximate result of the discrimination, Plaintiff has sustained, and will continue to sustain, economic damages to be proven at trial. As a result of Defendant's actions, Plaintiff has suffered emotional distress, resulting in damages in an amount to be proven at trial. Plaintiff further seeks compensatory and punitive damages and all other injunctive, declaratory, and monetary relief available for equal pay violations at trial, including liquidated damages for all willful violations, prejudgment interest, attorneys' fees and costs, and other compensation pursuant to 29 U.S.C. §216(b).

138.   Plaintiff is entitled to reasonable attorneys' fees and costs of suit.

## SIXTH CLAIM FOR RELIEF

Wrongful Discharge

Promissory Estoppel

*Cherokee Metro. Dist. v. Simpson*, 148 P.3d 142, 151 (Colo. 2006).

139.   The allegations contained above are incorporated by reference as if again fully set forth herein.

140. The elements for this cause of action are: 1) The employer made a promise to him; 2) The employer should have reasonably expected that its promise would induce action or forbearance by the employee; 3) The employee reasonably relied on the promise to his detriment; and 4) The promise must be enforced to prevent injustice.

141.   The Confidentiality Agreement contains two liquidated damages clauses – Accounting for Profits and Indemnification. A liquidate damage clause is inconsistent with an at-will employment agreement.   Furthermore, a contract terminable at-will is one that may be terminated at any time without legal consequences. The Confidentiality Agreement two years period of Non-Disclosure and Non-Use commenced when Plaintiff's employment was terminated. The termination of the employment agreement had legal consequences and, therefore, it was not employment at-will. The Entire Employment Contract was an employment contract.

142.   The Entire Employment Agreement clauses were inconsistent with an at-will employment contract. Therefore, it was not an at-will employment contract.

143.   The Employment Offer Letter states that "Nothing in this letter, or any other communication from Firm (Defendant), creates or implies an employment contract or term of employment or any promise of specific treatment upon which you (Plaintiff) can rely". However, the Confidentiality Agreement is a

communication from Firm (Defendant) that created an employment term. Defendant voided and/or modified the Employment Offer Letter's statement when he required Plaintiff to adhere to the Confidentiality Agreement. Furthermore, Defendant disclosed his true intentions when he relied on the Confidentiality Agreement employment terms to terminate Plaintiff's employment.

144. The Confidentiality Agreement contains a clause titled "AMENDMENTS" that states: "No amendments or modifications of the terms and conditions of this Agreement shall be valid unless in writing and signed by all of the parties hereto." However, Defendant unilaterally modified Plaintiff's employment terms and conditions when he changed Plaintiff's hourly wage to salary. The wage modification was not in written nor signed by all of the parties. Therefore, Defendant's actions revealed his real intentions and modified the Confidentiality Agreement's "AMENDMENTS" clause. Defendant's actions and verbal or written communications could amend the employment terms and conditions.

145. Malcom told Plaintiff that Defendant would pay for her time-off to study for the 2020 February Colorado's Bar exam. Defendant promised Plaintiff that she would be employed during her time-off to study for the 2020 February Colorado's Bar Exam.

146. Plaintiff relied on Malcom's words. Accordingly, she would be paid around $4,000 per month.

147. Defendant has paid for past law clerks time-off to study for the bar exam. It was reasonably for Plaintiff to rely on Defendant's actions and communications.

148. Defendant should have reasonably expected that his promise would induce action or forbearance by Plaintiff. Plaintiff was deterred to quit her job with Defendant until February 2020 because Defendant offered to pay for her time-off to study for the bar exam. Not many employers have the capacity to pay for their

employees' off-work study period and Defendant's promise would reasonably influence Plaintiff's employment decisions.

149.   Plaintiff reasonably relied on the promise to her detriment. She endured the hostile work environment and did not quit her job with Defendant due to the expectation of getting some time-off to study for the bar exam. Furthermore, Plaintiff abandoned hiring negotiations with Manuel Solis Law Firm because they could not pay for her time-off to study for the bar exam as Defendant would.

150.   Defendant falsely accused Plaintiff of breaching the Entire Employment Agreement and terminated the contractual relationship before February 2020. Defendant's allegations were unfounded and contrary to the agreement's terms. Defendant's allegations were a pretext.

151.   Plaintiff was fired less than a week after she abandoned employment negotiations with Manuel Solis Law Firm.

152.   Malcom's promise must be enforced to prevent injustice. Plaintiff should recover the promised compensation ($4,000) or the fair amount as the other law clerks would have received until February 2020.

153.   Plaintiff had an expectation of employment until 2020 February Colorado's bar exam date.

154.   Defendant did not keep his promise and caused damages to Plaintiff in doing so.

155.   Defendant's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's rights.

156.   Plaintiff suffered monetary, emotional and loss of employment damages.

157.   Plaintiff is entitled to reasonable attorneys' fees and costs of suit.

158.   Plaintiff seeks to recover economic damages, compensatory damages, punitive damages, emotional distress damages, lost wages, lost benefits, other

monetary losses and expectation damages arising from the breach.

## SEVENTH CLAIM FOR RELIEF

Wrongful Discharge

Breach of Employment Contract for a Definite Period of Time

Martin Marietta Corp. v. Lorenz, 823 P. 2de 100 (Colo. 1992)

159.    The allegations contained above are incorporated by reference as if again fully set forth herein.

160. The elements for this cause of action are: 1) the plaintiff and the defendant entered into a contract of employment; 2) the contract provided that the employment would continue for a definite period of time; 3) the defendant discharged the plaintiff before the end of that period of time; 4) before the plaintiff was discharged, she substantially performed her part of the contract; and 5) the plaintiff had injuries, damages and losses as a result of the discharge.

161.    Plaintiff employment terms and conditions were stablished by the Entire Employment Agreement. The employment contract was not an employment at-will as already mentioned in allegation 140. Plaintiff adhered to the Entire Employment Agreement and performed accordingly.

162.    Defendant voided the Entire Employment Agreement amendments clauses or modification statements with his actions. Defendant's actions and verbal or written communications could amend the employment terms and conditions. To this end, contracts can be expressed or implied.

163.    Malcom told Plaintiff that Defendant would pay for her time-off to study for the 2020 February Colorado's Bar exam. Defendant told Plaintiff that she would be employed during her time-off to study for the 2020 February Colorado's Bar Exam.

164.    Plaintiff accepted Malcom's offer and inquired about the specific terms and conditions of her offer. Malcom told Plaintiff that Defendant would allow her

up to six weeks of time-off to study for the bar exam and would pay her around $4,000 a month.

165. The parties' consideration would be her continued employment and adherence to the employment contract in exchange of Defendant's continued compensation during her time-off to study. Plaintiff accepted Malcom's offer.

166. Defendant breached the contract when he terminated Plaintiff's employment contract prior 2020 February Colorado's bar exam under false allegations and pretext.

167. Defendant discharged the plaintiff before the agreed definite period of employment under false allegations and pretext.

168. Before being discharge, Plaintiff performed her part of the employment contract.

169. Defendant's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's rights.

170. Plaintiff suffered monetary, emotional and loss of employment damages.

171. Plaintiff is entitled to reasonable attorneys' fees and costs of suit.

172. Plaintiff seeks to recover economic damages, compensatory damages, punitive damages, emotional distress damages, lost wages, lost benefits, other monetary losses and expectation damages arising from the breach.

## EIGHT CLAIM FOR RELIEF

Wrongful Discharge in Violation of Public Policy

Martin Marietta Corp. v. Lorenz, 823 P. 2de 100 (Colo. 1992)

173. The allegations contained above are incorporated by reference as if again fully set forth herein.

174. The elements for this cause of action are: 1) the employer directed the employee to perform an illegal act as part of the employee's work-

related duties; 2) that the action directed by the employed would undermine a clearly expressed public. Policy relating to the employee's basic responsibility as a citizen; 3) that the employee was terminated as the result of refusing to perform the act directed by the employer; and 4) that the employee had a reasonable belief that the action ordered by the employer was illegal, and that the employer was aware, or reasonably should have been aware, that the employee's refusal to comply with the employer's order was based on such reasonable belief. [a. That the employee present evidence showing that the employer was aware, that the employee's refusal to comply with the employer's order or directive was based on the employee's reasonable belief that the action ordered by the employer was illegal.]

175. Defendant requested Plaintiff to sign an Attorney Employment Contract. In the contract, Plaintiff was being referred as an attorney.

176. The Colorado's Code of Professional Responsibility prohibits the unauthorized practice of law. The unauthorized practice of law occurs when a person advertises or hold oneself as an attorney licensed to practice law in Colorado or when she or he actually engages in the practice of law while not an active member of the Colorado State Bar. [Rule 5.5]

177. The Colorado Bar Association prohibits a lawyer practicing where she is not authorized by law. Lawyers who permit another to practice law illegally, or who themselves practice law in a way they are not allowed are subject to formal discipline by the Colorado Bar Association and the Colorado Supreme Court.

178. By signing an attorney contract with a judiciary person, Franklin D. Azar & Associates, Plaintiff would have hold herself as an attorney to practice law in Colorado.

179. Plaintiff's agreement to sign a Colorado's employment contract where she holds herself as an attorney would have violated Colorado's public policy.

180.   Senior attorney Kenny Pennywelth advised Plaintiff not to sign the attorney contract because of the implications it could have.

181.   Plaintiff informed her supervisor, Malcom, about her conversation with Kenny Pennywelth and the reasons she did not want to sign the contract. Malcom said she would not make any exception for Plaintiff and would not change the Attorney Contract terms and wording. Malcom gave Plaintiff a deadline to sign the contract - until she did the attorney oath in Puerto Rico.

182.   When Plaintiff arrived from doing her attorney oath in Puerto Rico, her coworkers and supervisors started to mistreat her. They discriminated against plaintiff's nationality, sabotaged her work (interrupting and not responding her requests), demoted her, humiliated her, transferred her to less prestigious work assignments, interfered with her prestigious work assignments and terminated her.

183.   Plaintiff complained about the harassment and discrimination to Human Resources and to the supervisors. The supervisors falsely alleged and accused Plaintiff of violating the Confidentiality Agreement and proceeded to terminate her employment. The supervisor's false allegations were a pretext because Plaintiff did not violate the Confidentiality Agreement.

184.   Plaintiff was wrongfully terminated and retaliated against for her denial to sign and attorney employment contract and represent herself as an 'Attorney' in Colorado.

185.   Defendant's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from coercion to violate public policy. An employee should not be put to the choice of either obeying an employer's order to violate the law or losing her job.

186.   As a direct, legal and proximate result of the Wrongful Discharge, Plaintiff has sustained, and will continue to sustain, economic damages to be proven at trial.

187.   As a result of Defendant's actions, Plaintiff has suffered emotional distress, resulting in damages in an amount to be proven at trial.

188.   Plaintiff further seeks to recover economic damages, lost wages, lost benefits, other monetary losses, compensatory damages, exemplary damages, emotional distress damages, expectation damages and punitive damages.

189.   Plaintiff is entitled to reasonable attorneys' fees and costs of suit.

## NINTH CLAIM FOR RELIEF

Intentional Infliction of Emotional Distress

190.   The allegations contained above are incorporated by reference as if again fully set forth herein.

191.   The elements for this cause of action are: 1) an act by defendant amounting to extreme and outrageous conduct; 2) intent on the part of defendant to cause plaintiff to suffer severe emotional distress, or recklessness as to the effect of defendant's conduct; 3) causation, and; 4) damages – severe emotional distress.

192. An employer will be vicariously liable for tortious acts committed by his employee if the tortious acts occur within the scope of the employment relationship.

193.   Defendant intentionally or recklessly caused severe emotional distress and bodily harm to Plaintiff through its agents', employees' and supervisors' extreme and outrageous conduct. They willfully created a hostile work environment aimed to interfere with Plaintiff's work responsibilities and to inflict suffering on Plaintiff's emotional and physical wellbeing.

194.   Coworker Lowey caused Plaintiff severe emotional distress with his constant unwelcomed requests to assign her his work and when he belittled her because of her nationality and professional qualifications.

195.   Coworker Lowey's outrageous comments prompted Plaintiff's first national origin discrimination complaint. Right after Plaintiff complaint for the

discrimination, the management personal created a hostile work environment (retaliatory harassment) through their subordinates. Plaintiff endured a whole month of constant work sabotage, demotions, ridiculing and humiliation that reinforced that Defendant supported Coworker Lowey's discriminatory beliefs – that someone from Colorado *is above* someone from Puerto Rico.

196.   The harassing and humiliations were so constant and pervasive that Plaintiff made a formal complaint to Human Resources and Defendant's administrator. However, when she submitted the formal complaint, Malcom told her that it was her who ordered the senior attorneys to unreasonably interfere with her work performance, demote her and create an intimidating, hostile and offensive work environment. Furthermore, when Plaintiff submitted the complaint Malcom falsely accused her of violating the Attorney-client privilege and the Confidentiality agreement and proceeded to terminate her under pretext. The termination was the ultimate humiliating statement in support of Coworker Lowey's prior derogatory comments.

197.   Supervisor Balkin caused Plaintiff severe emotional distress when he demoted her and humiliated her in front of her coworkers in the middle of the attorney's conference.

198.   Malcom caused Plaintiff severe emotional distress through the manipulation of her subordinates to take specifics actions that would result in a hostile work environment.

199.   Attorney Marino, by instruction of Malcom, transferred Plaintiff to less prestigious work assignments right after she complained about Coworker Lowey's derogatory comments causing Plaintiff severe emotional distress.

200.   Attorney McCrary caused Plaintiff severe emotional distress when he humiliated her in the middle of a training conference in front of other coworkers by asking her to step out to do his work because she is a Spanish speaker. Plaintiff

inquired whether the assignment could be done after the conference and McCrary responded her that he needed it urgently. McCrary interfered with Plaintiff's prestigious assignments and interfered with her work responsibilities (work sabotage) by interrupting Plaintiff's required training.

201.  Malcom or Supervisor Balkin sabotaged Plaintiff's work by assigning her 30 cases during her training period contrary to the office's usual practices of assigning less than 10 cases and build up the case load at a rational pace. In less than a month plaintiff was working 48 cases compared to the 30 cases that Law Clerk Conroy had during his whole employment. Furthermore, management personal wanted to assign Plaintiff more cases. The excessive and unfair assignment of work inflicted severe emotional distress on Plaintiff.

202.  Plaintiff constant work interruptions affected her work performance. Moreover, many attorneys were not answering her requests to move the cases forward. Her cases started to fall behind which in turn caused her more stress and anxiety (severe emotional distresses) as other attorneys have been fired precisely for not moving their cases forward.

203.  Plaintiff emotional distress was such that her musculoskeletal system, sleeping patterns and personal relationships got compromised. Plaintiff had to visit a chiropractic and a psychologist in multiple occasions.

204.  Malcom caused Plaintiff severe emotional distress when she terminated Plaintiff's employment after all the harassing she underwent. The termination was the ultimate way of humiliating Plaintiff in front of the coworkers that contributed to the retaliatory harassment.

205.  Defendant caused Plaintiff severe emotional distress through: the excessive case assignments; the request to work overtime on weekends without compensation due her to national origin; the humiliation based on her professional qualifications and nationality; the excessive request to take intake calls due to

national origin; the constant work request and assignments from other employees based on her nationality (the constant exploitation and work sabotage); the compliance (and therefore humiliation) with coworkers requests for fear of retaliation for insubordination or some discriminatory reason; the demotion in front of other coworkers as retaliation for stepping up to a coworkers derogatory and discriminatory comments or/and as retaliation for complying with Colorado's public policy and not signing an attorney contract; the transfer to less prestigious work assignments; the silent treatment and disregard of her requests to move cases forward; the supervisors abuse of power; and the plaintiff's feelings of impotence.

206.   In other words, Defendant intentionally or recklessly created a hostile, discriminatory, exploitative, and humiliating work environment with the sole purpose of inflicting emotional suffering on Plaintiff for not complying with the supervisor's requests to violate Colorado's public policy; or for stepping up against her coworker discriminatory and derogatory comments.

207.   Defendant's conduct was so extreme in degree as to go beyond all possible bounds of decency so as to be regarded as atrocious and utterly intolerable in a civilized community.

208.   As a consequence of Defendant's outrageous conduct, Plaintiff experienced highly unpleasant mental reactions such as grief, shame, humiliation, embarrassment, anger and disappointment in such extreme degree that no person of ordinary sensibilities could be expected to tolerate and endure it.

209.   As a result of Defendant's actions, Plaintiff has suffered emotional distress, resulting in damages in an amount to be proven at trial.

210.   Plaintiff further seeks to recover compensation for mental anguish, noneconomic losses or injuries Plaintiff has had to the present time or that Plaintiff will probably have in the future, including: physical and mental pain and suffering, inconvenience, emotional stress, fear, anxiety, embarrassment, humiliation, public

disgrace, indignity, and impairment of the quality of life.

211. Plaintiff further seeks to recover any economic losses plaintiff has had to the present time or will probably have in the future, including: loss of earnings or income; ability to earn money in the future; reasonable and necessary medical, hospital and other expenses.

212. Plaintiff further seeks to recover punitive damages.

213. Plaintiff is entitled to reasonable attorneys' fees and costs of suit.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1. For a declaration that Defendant's actions, policies, and practices as alleged herein are unlawful;

2. For lost wages, expectation damages and all other compensation denied or lost to Plaintiff by reason of Defendant's unlawful actions, in an amount to be proven at trial;

3. For compensatory damages for Plaintiff's emotional pain and suffering, in an amount to be proven at trial;

4. For punitive and exemplary damages in an amount to be determined at trial;

5. For interest on lost wages, compensation, and damages, including pre- and post-judgment interest and an upward adjustment for inflation;

6. For back pay and front pay within the contract term;

7. For reasonable attorneys' fees and costs of suit and;

8. For such other and further relief as this Court deems just and proper.

Dated: January 13, 2020                     Respectfully submitted,

                                             Krystina A. Romero

By:

_____
KRYSTINA A ROMERO

s/ Krystina Andrea Romero

*Krystina Andrea Romero*

6750 E Chenango Ave

Apt 505

Denver, CO 80237

Telephone: (787) 602-7489

E-mail: krystinaromero@gmail.com

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all causes of action and claims to which they have a right to a jury trial.

Dated:  January 15, 2020                    Respectfully submitted,

                                            Krystina A Romero

s/ Krystina Andrea Romero

*Krystina Andrea Romero*

6750 E Chenango Ave

Apt 505

Denver, CO 80237

Telephone: (787) 602-7489

E-mail: krystinaromero@gmail.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____
(To be supplied by the court)

Krystina Andrea Romero
_____, Plaintiff

v.

Franklin D Azar & Associates, P.C.
_____,

_____,

_____,

_____, Defendant(s).

*(List each named defendant on a separate line. If you cannot fit the names of all defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed in the above caption must be identical to those contained in Section B. Do not include addresses here.)*

**EMPLOYMENT DISCRIMINATION COMPLAINT**

| NOTICE |
| --- |
| Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. |

## A. PLAINTIFF INFORMATION

*You must notify the court of any changes to your address where case-related papers may be served by filing a notice of change of address. Failure to keep a current address on file with the court may result in dismissal of your case.*

Krystina Andrea Romero  6750 e Chenango Ave. 505 Denver CO 80237

(Name and complete mailing address)
787-602-7489. krystinaromero@gmail.com

(Telephone number and e-mail address)

## B. DEFENDANT(S) INFORMATION

*Please list the following information for each defendant listed in the caption of the complaint. If more space is needed, use extra paper to provide the information requested. The additional pages regarding defendants should be labeled "B. DEFENDANT(S) INFORMATION."*

Defendant 1: Franklin D Azar & Associates PC 14426 East Evans Ave, Aurora CO 80014

(Name and complete mailing address)
855-417-0342

(Telephone number and e-mail address if known)

Defendant 2: _____

(Name and complete mailing address)

_____

(Telephone number and e-mail address if known)

## C. JURISDICTION

*Identify the statutory authority that allows the court to consider your claim(s): (check all that apply)*

X
____ Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et seq. (employment discrimination on the basis of race, color, religion, sex, or national origin)

____ Americans with Disabilities Act, as amended, 42 U.S.C. §§ 12101, et seq. (employment discrimination on the basis of a disability)

____ Age Discrimination in Employment Act, as amended, 29 U.S.C. §§ 621, et seq. (employment discrimination on the basis of age)

X                                    Equal Pay Act
____ Other: (*please specify*) _____

2

**D.    STATEMENT OF CLAIM(S)**

*State clearly and concisely every claim that you are asserting in this action and the specific facts that support each claim. If additional space is needed to describe any claim or to assert additional claims, use extra paper to continue that claim or to assert the additional claim(s). Please indicate that additional paper is attached and label the additional pages regarding the statement of claims as "D. STATEMENT OF CLAIMS."*

Discrimination

CLAIM ONE:  _____

The conduct complained of in this claim involves the following: (*check all that apply*)

        X
____ failure to hire                    ____ different terms and conditions of employment

____ failure to promote                 ____ failure to accommodate disability
  X                                        X
____ termination of employment          ____ retaliation

____ other: (*please specify*) _____

Defendant's conduct was discriminatory because it was based on the following: (*check all that apply*)

                              X
____ race        ____ religion      ____ national origin        ____ age
                  X
____ color       ____ sex           ____ disability

Supporting facts:

CLAIM TWO: _____

The conduct complained of in this claim involves the following: (*check all that apply*)

____ failure to hire                        ____ different terms and conditions of employment

____ failure to promote                     ____ failure to accommodate disability

____ termination of employment              ____ retaliation

____ other: (*please specify*) _____

Defendant's conduct was discriminatory because it was based on the following: (*check all that apply*)

____ race          ____ religion       ____ national origin        ____ age

____ color         ____ sex            ____ disability

Supporting facts:

## E.    ADMINISTRATIVE PROCEDURES

Did you file a charge of discrimination against defendant(s) with the Equal Employment Opportunity Commission or any other federal or state agency? (*check one*)

☑ Yes (***You must attach a copy of the administrative charge to this complaint***)

☐ No

Have you received a notice of right to sue? (*check one*)

☑ Yes (***You must attach a copy of the notice of right to sue to this complaint***)

☐ No

## F.    REQUEST FOR RELIEF

*State the relief you are requesting or what you want the court to do. If additional space is needed to identify the relief you are requesting, use extra paper to request relief. Please indicate that additional paper is attached and label the additional pages regarding relief as "F. REQUEST FOR RELIEF."*

## G.    PLAINTIFF'S SIGNATURE

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct. *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

(Plaintiff's signature)

1 / 13 / 2020

(Date)

(Revised December 2017)

5